MARY ANN REED, RESPONDENT, v. AUGUSTUS ASH ET AL., APPELLANTS.

Are the sureties on a Constable's bond liable for a trespass committed by him under color of process? And if so, is the liability primary, or are they only answerable after the liability of the Constable has been fixed by judgment?

When R loaned money to M for the purchase of cattle, with an agreement that R was to have a lien on all the cattle purchased until her loan was repaid, this does not vest any title to the cattle in R, as they are purchased. Her lien in such case could only be made good by taking possession before attachment by other creditors.

APPEALED from the First Judicial District Court, Hon. CALEB BURBANK, presiding.

*W. C. Wallace,* for Appellants.

Our statute does not authorize the bringing of any suit on a Constable's bonds: consequently, whatever are the liabilities of the Constable and sureties, are fixed by the rules of the common law.

The sureties in the bond only undertake that the officer will faithfully perform the duties of his office. They do not undertake to indemnify those against whom the officer has no process, that he will not trespass on their property.

The complaint in this case avers a general property in plaintiff, but does not show either the possession or right of possession in plaintiff when the alleged trespass was committed. McMillan may have had a special property in the articles sold subject to execution.

I find cases cited where officers have been sued in trespass, trover and replevin, for property seized under color of office, and upon recovery of judgment and failure to make the same the sureties have been held liable. But I find no reported case where an officer and his sureties have been held liable in an action of this kind on the official bond.

The lien of plaintiff, although good as to McMillan, was void as to creditors, because the possession of the property remained with McMillan.

*Pitzer & Keyser,* for Respondent.

The action was brought properly on the official bond, without any previous action against the officer.    ( *Van Pelt* v. *Littler*, 14 Cal. 196.)

The allegation of title in the plaintiff, and that her property was taken and sold to satisfy an execution against McMillan, was sufficient.    No averment of possession was necessary.

Opinion by BEATTY, C. J., LEWIS, J., concurring.

This was an action brought by plaintiff against the defendant Ash and his sureties on a Constable's bond.    The substance of the complaint is, that Ash having in his hands process legally issued against one McMillan had, whilst acting under color of such process, seized and sold three yoke of oxen, the property of plaintiff; that this unlawful seizure of the property of plaintiff, under color of process, was a breach of his official bond, whereby he and his sureties became liable to plaintiff for the damages resulting from the unlawful seizure.

The defendants justified under the suit, and alleged the property to be that of defendant in execution, McMillan.    The cause was tried before a jury, and they found for the plaintiff.

The defendants gave notice of motion for a new trial, and made the statement and motion in due time.    The Court below overruled the motion, and defendants appeal.

The first point made by defendants is, that plaintiff has mistaken her remedy.    That the act of the Constable, if unlawful, was simply a trespass against the plaintiff, and her remedy was only by trespass or trover against the Constable.    That if the sureties were liable at all, it was not a primary liability, but one which could only arise after judgment against the Constable in trespass or trover, and an inability to make the judgment by execution.    Upon this point the authorities are certainly contradictory, and for this case it is not necessary to decide the point.    The evidence was totally insufficient to sustain the verdict.    The facts, as shown by the plaintiff's own testimony, were these :    About the sixteenth of October, 1865, plaintiff loaned McMillan $200, at an interest of two per cent. per month.    On the 28th of October, she loaned him $300 or $350 more, (she says $350, McMillan says $300) on condition

that McMillan should lay out the money in cattle, and give them to her as security for the money loaned.   On the same day McMillan bought one yoke of cattle and returned to plaintiff $200 of the borrowed money.    On the twenty-ninth, he again got the $200 which he had returned the evening before, and with that and $100 borrowed from another source, bought a wagon and two more yoke of cattle. Neither of these purchases were made by McMillan in person. The first yoke of cattle was bought by a man named Arnett, who was in McMillan's employ.   McMillan gave him the money to buy them.   He knew nothing of where the money came from.   He acted solely as the agent of McMillan.   He took the bill of sale in his own name, but delivered that and the cattle to McMillan.    A man named Coughlin, also in the employ of McMillan, bought the other two yoke of cattle and the wagon for McMillan.   McMillan furnished him $200 of the money, telling him he got it of Mrs. Reed, (the plaintiff) and Coughlin says the other $100 he himself advanced.     After the cattle and wagon were all purchased, McMillan showed them to plaintiff, and said to her " they were her property until I paid her."   The plaintiff herself gives the following account of the transaction :   " I know McMillan and Coughlin.   I let McMillan have $350 on the 28th of October, 1865. I let him have $200 the next day.   He returned $200 of the $350 the first night.   He said he wanted to buy some cattle.   I gave him the money on the conditions that he gave me the cattle for security.   He bought cattle, and in a day or two bought two yoke of cattle, and afterwards showed me the three yoke of cattle and a wagon, and said, ' Look at your property.' "    From that time until the cattle were seized by the Constable for the debt of McMillan, they were exclusively under the control of McMillan, his employés, or persons whom he took in temporarily as partners.

Respondent contends that this shows a purchase of the cattle by McMillan as the agent of the plaintiff; that the title of the cattle when purchased vested in plaintiff, and that there was only a contract between plaintiff and McMillan allowing him to buy the cattle when he got the money to do so.

We cannot view the contract in that light if we are to believe either McMillan or the plaintiff.   They both speak of the transac-

Reed *v.* Ash.

tion as a *loan.* The plaintiff says she loaned the money on the condition that McMillan would give her " the cattle for security." Now, if the cattle were hers when purchased, how could McMillan give them to her as security?

Had Mrs. Reed furnished money to McMillan to buy cattle *for her*, with a distinct agreement that McMillan might use the cattle with the privilege of buying them at any time he got the money, such contract would not have been affected by the Statute of Frauds. The possession of McMillan would not have been inconsistent with the title of plaintiff. Had the cattle died, the loss would have been hers. No debt would have existed in such case from McMillan to her. But the actual contract proved was far different. The proof as made by the plaintiff herself is, that she loaned the money. She did not buy the cattle, but merely had a verbal contract with McMillan that he should give her security on the cattle. This was a good contract as between them; and if the cattle had been delivered to plaintiff under this contract, and she had retained the possession, at any time before levy, that possession would have protected her. But until there was an actual delivery under her contract, she had no security which would avail against an attaching creditor. Nor, if there had been an actual delivery, would her security have held good one hour longer than she retained possession.

The Court below seems to have formed its instructions on the theory that if the money was loaned only on condition that it should be expended for cattle, and that when the cattle were purchased that plaintiff should have a lien on them, she would have the same right to the cattle that she would have had if they had been bought for her in her name, and with a mere contract on her part to sell to McMillan in the event of his being able and willing to buy. This was certainly an erroneous view of the case. The making of an agreement before the loan of the money for security on the cattle was no more effectual to secure the plaintiff than the execution of a mortgage after the purchase would have been. If they were McMillan's cattle, in order to secure plaintiff she must have obtained possession before any other lien attached. It is not pretended she had any possession when they were attached.

The judgment must be reversed, and a new trial ordered.